**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

*Counsel for Plaintiff Public Employees'*
*Retirement System of Mississippi*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>SEAGATE TECHNOLOGY HOLDINGS PLC, WILLIAM DAVID MOSLEY, and GIANLUCA ROMANO,<br><br>        Defendants. | Case No.  23-cv-3711<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, the Public Employees' Retirement System of Mississippi ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, inter alia, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Seagate Technology Holdings plc ("Seagate" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Seagate; and (d) other public information regarding the Company.

## I.      INTRODUCTION

1.      Plaintiff brings this securities class action on behalf of all persons or entities that purchased or otherwise acquired Seagate common stock between September 15, 2020 and October 25, 2022, inclusive (the "Class Period").

2.      The claims asserted herein are alleged against Seagate and certain of the Company's senior officers (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3.      Seagate is a leading provider of data storage technology and infrastructure solutions.  The Company's principal products are hard disk drives, commonly referred to as hard drives or "HDDs."  These HDDs contain certain U.S. software and components that subject any transaction involving these products to the U.S. Export Administration Regulations.

4.      Specifically, these mass capacity drives are used in a variety of applications including cloud computing, content delivery, backup services, and surveillance platforms.  One of Seagate's key customers is Chinese telecommunications giant, Huawei Technologies Co. Ltd. ("Huawei").

5.      In 2019, the U.S. Department of Justice charged Huawei and its CFO, Meng Wanzhou, with bank fraud, money laundering, and conspiracy to obstruct the operations of the Treasury Department's Office of Foreign Assets Control in Iran.  In the wake of those charges and

in response to national security concerns surrounding Huawei's facilitation of surveillance by the Chinese government, in 2019, the U.S. Department of Commerce's Bureau of Industry and Security ("BIS") placed Huawei on the trade restriction list, called the "Entity List." The Entity List is a key regulatory tool used to impose targeted controls on entities that the U.S. deems to be involved in activities contrary to national security or foreign policy interests. Regulated products and components cannot be sold to a company on the Entity List without first obtaining a special license from BIS.

6. On August 17, 2020, BIS refined its regulations against Huawei by clarifying that the restriction applies not only when Huawei is the end user of the product, but also to any transaction where "there is knowledge" that Huawei or any of its affiliates listed on the Entity List are parties to the transaction.

7. Following the August 2020 amendment, two of the three primary manufacturers and distributors of HDDs—Western Digital and Toshiba—publicly announced that they would cease sales to Huawei. In contrast, Seagate publicly stated that its HDDs were not subject to the Export Administration Regulations and that as such it did not require a special license to sell HDDs to Huawei.

8. Throughout the Class Period, Seagate repeatedly assured investors that the Company "continually monitor[s] and remain[s] in compliance with all the rules and regulations" imposed by U.S. regulators. Seagate also stated that it "conducts full and rigorous export control assessments to ensure compliance with trade laws and regulations." Despite the imposition of the trade restrictions, Seagate reported significant growth in HDD sales during the Class Period, which it attributed to, among other things, superior execution and significant and growing demand for HDDs. As a result of these representations, the price of Seagate common stock traded at artificially inflated prices throughout the Class Period.

9. The truth began to emerge on October 26, 2021, when a group of senators from the U.S. Senate Committee on Commerce, Science, and Transportation (the "Senate Committee") released a report urging BIS to take action against Seagate for its illicit sales to Huawei. The

Senate Committee's investigation consisted of interviews with analysts and certain unnamed Seagate personnel who reported that Seagate's market share increased substantially following the imposition of sanctions against Huawei. As a result of this disclosure, the price of Seagate common stock declined by $1.09 per share.

10. Throughout 2022, Seagate repeatedly reported earnings that were below expectations and lowered revenue and earnings guidance, which the Company attributed to "disruption in the Chinese market" and lower demand in China.

11. Then, on October 26, 2022, Seagate announced that it had received a Proposed Charging Letter (the "Charging Letter") from BIS alleging violations of the U.S. export controls and sanctions. That same day, Seagate reported that HDD sales had plummeted by 26% for its fiscal first quarter ended September 30, 2022. As a result of these disclosures, the price of Seagate common stock declined by $4.61 per share, or nearly 8%.

12. Following the end of the Class Period, on April 19, 2023, after the market closed, BIS announced that it had imposed a $300 million civil penalty against Seagate for violating the ban on HDD sales to Huawei—the largest standalone administrative resolution in the agency's history. According to the BIS order, through its investigation BIS determined that between August 2020 and September 2021, Seagate sold 7.4 million HDDs to Huawei, which were valued at more than $1.1 billion. Making matters worse, throughout 2021, after Seagate's competitors had already stopped selling HDDs to Huawei, Seagate "repeatedly authorized extending lines of credit to Huawei totaling more than $1 billion dollars," which further fueled sales to Huawei, benefiting both Huawei's alleged criminal activity and the Chinese Communist Party.

13. As a result of Defendants' actions detailed herein, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Seagate's principal executive office is located in Fremont, California, which is situated in this District, and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

17.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.   Plaintiff

18.     Plaintiff is a pension fund established for the benefit of the current and retired public employees of the State of Mississippi.  Plaintiff is responsible for the retirement income of employees of the state, including current and retired employees of the state's public-school districts, municipalities, counties, community colleges, state universities, libraries and water districts.  Plaintiff provides benefits to over 75,000 retirees, manages over $33 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 250,000 current public employees.  As indicated on the certification submitted herewith, Plaintiff purchased shares of Seagate common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein—specifically, fraudulent conduct covering up support of Chinese espionage and ultimately costing the public employees of the State of Mississippi, as well as countless other investors, billions.  Accordingly, the State of Mississippi has an ongoing interest in halting the impact of the Chinese Communist Party's predatory practices and that of the entities who enable it.

**B.     Defendants**

19.     Defendant Seagate is a provider of data storage technology and infrastructure solutions.  The Company maintains its U.S. headquarters at 47488 Kato Road, Fremont, California. Seagate's common stock trades on NASDAQ under ticker symbol "STX."  As of April 24, 2023, Seagate had over 207 million shares of common stock outstanding, owned by hundreds or thousands of investors.

20.     Defendant William David Mosley ("Mosley") is, and was at all relevant times, Seagate's Chief Executive Officer ("CEO") and a Director of the Company throughout the Class Period.

21.     Defendant Gianluca Romano ("Romano") is, and was at all relevant times, Seagate's Chief Financial Officer ("CFO") a Director of the Company throughout the Class Period.

22.     Defendants Mosley and Romano are collectively referred to herein as the "Officer Defendants."  The Officer Defendants, because of their positions with Seagate, possessed the power and authority to control the contents of Seagate's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

**IV.     BACKGROUND**

23.     Seagate is a global manufacturer and distributor of HDDs designed for mass capacity storage and legacy markets.  HDDs contain certain U.S. origin software and technology that subjects the sale of these devices to certain regulations, including Export Administration Regulations.

24.     One of Seagate's key customers is Chinese telecommunications company, Huawei. On May 16, 2019, Huawei and certain of its non-U.S. affiliates were added to the U.S. Department of Commerce's Entity List following a determination by the End-User Review Committee, composed of representatives of the U.S. Departments of Commerce, State, Defense, and Energy, that Huawei's designation on the list was necessary to protect national security and foreign policy interests.

25.     Huawei's designation on the Entity List came on the heels of a grand jury investigation that led the Department of Justice to charge Huawei and its CFO, Meng Wanzhou, with conspiracy, bank fraud, wire fraud, sanctions violations, money laundering, and the orchestrated obstruction of justice in an effort to obtain embargoed computer equipment for Iran.

26.     In addition to flouting sanctions against Iran, Huawei was added to the Entity List because of its close ties to the Chinese Communist Party and its assistance in the party's large-scale deployment of surveillance technologies.  By restricting Huawei's import of specific U.S. technology, the Department of Commerce aimed to complicate Huawei's global launch of its surveillance infrastructure.

27.     The HDDs Seagate manufactured are mass capacity drives that support nearline applications and support video and image applications, all of which are used in surveillance platforms.

28.     Huawei's designation on the Entity List meant that companies manufacturing products containing certain U.S.-origin components that were subject to the Export Administration Regulations were required to obtain a special license from BIS for the export, reexport, and transfer (in-country) of all such products, where Huawei or any of its listed affiliates were end users in the transaction according to the sale agreements.

29.     On August 17, 2020, BIS amended these regulations by clarifying that the restriction and license requirement applies not only when Huawei is the end user of the item, but also applies to any transaction in which "there is knowledge" that Huawei or any of its affiliates listed on the Entity List are parties to the transaction.  BIS explained that the amended regulations

were put in place to "narrowly and strategically target Huawei's acquisition of semiconductors that are the direct product of certain U.S. software and technology."

30.     Following this rule change, Seagate's primary competitors, Western Digital and Toshiba, promptly ceased HDD sales to Huawei.

31.     Seagate, on the other hand, assured investors that its HDDs were not subject to Export Administration Regulations and, as a result, Seagate was not required to obtain a special license to sell HDDs to Huawei.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

32.     The Class Period begins on September 15, 2020, the first trading day after Seagate executives presented at the Deutsche Bank 2020 Technology Conference which took place on September 14, 2020, after markets closed.  During the conference, Seagate's CFO, Defendant Romano, was asked about the impact of BIS' amendments to the Export Administration Regulations against Huawei.  Defendant Romano stated "I don't see any particular restriction for us in terms of being able to continue to ship to Huawei or any other customers in China. So we don't think we need to have a specific license."

33.     On October 22, 2020, Seagate issued a press release announcing its financial results for its fiscal first quarter of 2021.[1]  That same day, Seagate held a conference call with analysts and investors to discuss the Company's financial results.  During that call, which took place on October 22, 2020, after markets closed, Seagate's CEO, Defendant Mosley, reported that revenue from sales of video image application HDDs "doubled-quarter-over-quarter."  Mosley attributed the growth to a variety of factors, including a "resurgence in on-prem security and smart video projects."  During the conference call, Defendant Romano, reported that nearline HDD sales were "up 36% year on year, reflecting broad market demand for our high capacity nearline drives."  In response to a question about the Company's continued sales of HDDs to Huawei, Defendant

---

[1] Seagate operates and reports financial results on a fiscal year of 52 or 53 weeks ending on the Friday closest to June 30.

Mosley assured investors that "[w]e continually monitor and remain in compliance with all the rules and regulations around."

34.     On January 21, 2021, Seagate issued a press release announcing its financial results for its fiscal second quarter of 2021.  In the press release, which was also filed with the SEC on Form 8-K, Seagate stated that it "delivered strong, double-digit revenue, earnings" supported by "broad-based improvement across nearly every served market and geography" and "solid customer demand for our mass capacity products."  The Company added that "[a]s demand for data increases in both the cloud and at the edge," Seagate's "HDD portfolio" positions the Company to "address both the secular demand for mass capacity storage and the increasing complexity of managing data from edge-to-core cloud" thereby "benefit[ing] from the tremendous opportunities [it] foresee[s] ahead."

35.     That same day, Seagate held a conference call with analysts and investors to discuss the Company's financial results.  During the call, Defendant Romano reported that "[o]n a revenue basis, HDD accounted for 92% of total December quarter revenue and mass capacity storage represented 62% of HDD revenue."  Defendant Mosley attributed the Company's success and expected growth to Seagate's "leadership in HDD technology and execution on our product roadmap" and "the burgeoning demand for data."

36.     On February 24, 2021, Seagate held a 2021 Virtual Analyst Event during which Defendant Romano boasted that the Company's HDD revenue had "reached an inflection point, with mass capacity representing over 60% of our revenue in the most recent quarter and is expected to reach over 90% by fiscal year 2025."  Romano attributed the growth to "strong demand from cloud data center customers and video and image applications combined with [the Company's] leading product portfolio."

37.     On April 22, 2021, Seagate issued a press release announcing its financial results for its fiscal third quarter of 2021.  In the press release, which was also filed with the SEC on Form 8-K, Defendant Mosley is quoted as stating that the Company "delivered another quarter of strong financial performance driven by ongoing operational execution and record sales of our high

capacity nearline drives."  Mosley added that the "results underscore the strength of our HDD product portfolio and increasing demand for mass capacity storage."  In the press release, Defendant Mosley also stated that Seagate was well positioned to gain market share through its "innovative technology, flexible product roadmap and mass data expertise" that makes Seagate "well positioned to capture significant opportunities in our core HDD business."

38.    That same day, Seagate held a conference call with analysts and investors to discuss the Company's financial results.  During the call, Defendant Mosley reported "[s]trong cloud data center demand and ongoing recovery in the enterprise markets drove our highest ever HDD shipments of 140 exabytes and record mass capacity revenue of more than $1.6 billion."

39.    On June 8, 2021, Defendant Romano represented Seagate at the Bank of America Global Technology Conference.  During the conference, Defendant Romano continued to assure investors that the Company complied with export regulations, stating that "the truth is we comply with all the rules and regulations.  And based on that, we ship for all our customers following those rules and regulations."  Defendant Romano further stated that "it's part of our job to ensure that we understand and then we follow all the rules and regulations of that trade."

40.    On August 6, 2021, Seagate filed with the SEC its annual report on Form 10-K for the fiscal year ended July 2, 2021.  The Form 10-K was signed by Defendant Mosley and contained certifications by Defendants Mosley and Romano that attested to the purported accuracy and completeness of the 10-K.  In the 10-K, the Company purported to warn investors that "[a] significant portion of [its] sales are to customers which are located in geographies that have been the focus of recent changes in U.S. policies."  The Company further purported to warn that some of its products and services are subject "to export control laws and other laws affecting the countries in which [its] products and services may be sold, distributed, or delivered" and added that "any changes to or violation of these laws could have a material adverse effect" on its business.  Seagate also stated that if it was "ever found to have violated applicable export control laws, [the Company] may be subject to various penalties available under the laws, any of which could have a material and adverse impact on [its] business."

41.     On August 12, 2021, U.S. Senator Roger Wicker sent a letter to Seagate on behalf of the Senate Committee, remarking on the Company's response to his original letter dated May 10, 2021.  In the May 2021 letter, Senator Wicker had requested information regarding Seagate's compliance with the export control regulations and sanctions imposed against Huawei.  According to Senator Wicker's August 2021 letter, Seagate had responded to the Senate Committee on May 21, 2021, reiterating that the Company "conducts full and rigorous export control assessments to ensure compliance with trade laws and regulations."

42.     On October 22, 2021, Seagate issued a press release announcing its financial results for its fiscal second quarter of 2022.  In the press release, which was also filed with the SEC on Form 8-K, Defendant Mosley is quoted reporting that "[m]ass capacity revenue topped the $2 billion mark for the first time," which Mosley attributed to "ongoing demand from cloud data center customers and strength in the video and image applications markets."  Defendant Mosley added that "[l]ong-term, secular demand for mass capacity storage underpins our multi-year financial growth targets" and that the Company's "innovative technology roadmap and operational agility position the company well to capture these growing opportunities" and "deliver value for customers and shareholders."

43.      The same day, Seagate held a conference call with analysts and investors to discuss the Company's financial results.  During the call, Defendant Romano boasted that "mass capacity revenue was up . . . 51% compared with the prior year period" and that total HDD revenue grew "to $2.9 billion, up 5% sequentially and 34% year-over-year."  Defendant Romano added, "[g]rowth was driven by increasing demands for [its] mass capacity products which contributed 71% of total HDD revenue and 83% of HDD exabyte shipment."  Defendant Mosley additionally boasted that the Company "continue[s] to leverage [its] strong arsenal of innovative technologies, manufacturing agility, and industry expertise to deliver attractive total cost of ownership solutions aligned with [its] customer's roadmap."

44.     The statements set forth above in paragraphs 33 through 44 were materially false and misleading.   In truth, Seagate has now admitted that it disregarded applicable export

regulations and sold millions of HDDs to Huawei in violation of U.S. law.  Moreover, Seagate's sales of HDDs during the Class Period were driven, in significant part, by these illicit sales and the fact that Seagate's two main competitors ceased selling HDDs to Huawei, giving Seagate a near monopoly on sales to Huawei.

## VI.    THE TRUTH EMERGES

45.    The truth began to emerge on October 26, 2021, when the Senate Committee released a report urging BIS to take action against Seagate for its illicit sales to Huawei.  The Senate Committee's investigation consisted of interviews with market analysts and certain unnamed Seagate personnel who reported that Seagate's market share increased substantially following the imposition of sanctions against Huawei.  As a result of these disclosures, the price of Seagate common stock declined by $1.09 per share, from a closing price of $89.16 on October 25, 2021, to a closing price of $88.07 on October 26, 2021.

46.    Then, on March 8, 2022, during the Morgan Stanley Technology, Media and Telecom Conference, Seagate lowered its earnings guidance for the upcoming fiscal third quarter of 2021, ending April 1, 2022.  Defendant Mosley attributed the poor outlook to disruption in the market in China.  These disclosures caused the price of Seagate common stock to decline by $9.52 per share, or 9.5%, from a closing price of $100.09 on March 7, 2022, to a closing price of $90.57 on March 8, 2022.

47.    During the March 8, 2022 conference, Defendant Mosley sought to assuage investor concerns regarding the declining outlook, assuring investors that the shortfall was "fairly isolated" and "transitory," and simply the result of "things turning back on after Chinese New Year" and "just the world waking back up was a little slow."  Mosley further explained that since the Company "transitioned to a mass capacity platform that was highly leverageable" there is "enough of a compelling value proposition that [it is] getting good long-term visibility with [its] customers."

48.    The statements set forth above in paragraph 48 were materially false and misleading.  In truth, Seagate's sales of HDDs during the Class Period were driven largely by illicit

sales to Huawei along with the fact that Seagate's two main competitors ceased selling HDDs to Huawei, which gave Seagate a near monopoly on HDD sales to Huawei.  Once Seagate ceased HDD sales to Huawei around September 2021, the Company experienced an acute decline in revenues derived from the sale of HDDs, particular in the Asian market.

49.    On July 21, 2022, however, Seagate reported disappointing financial results for the fiscal fourth quarter of 2022, with revenue that declined by 12.8% year-over-year, well below the Company's guidance.  Seagate once again attributed the poor results to lower demand from China, which had caused a spike in channel inventory.  As a result, Seagate announced that it had cut production on new HDDs, which analysts with Rosenblatt Securities tied to "an effort to burn Asia customer inventory builds."  The Company additionally guided down its revenue projections for the fiscal first quarter of 2023.  As a result of these disclosures, the price of Seagate common stock declined by $6.78 per share, or 8.1%, from a closing price of $83.61 on July 21, 2022, to a closing price of $76.83 on July 22, 2022.

50.    Then on October 26, 2022, Seagate disclosed that it had received a Proposed Charging Letter from BIS alleging violations of the export sanctions.  That same day, Seagate reported that HDD sales had continued to decline by a staggering 26% in the fiscal first quarter ended September 30, 2022.  Once again, Seagate attributed the shortfall to declining demand in China.  As a result, the Company announced that it had further adjusted its production output, lowered its fiscal year 2023 capital expenditures, and would implement a restructuring plan that would reduce its worldwide headcount by 8%.  As a result of these disclosures, the price of Seagate common stock declined by $4.61 per share, or nearly 8%, from a closing price of $58.00 on October 25, 2022, to a closing price of $53.39 on October 26, 2022.

## VII.    POST-CLASS PERIOD DEVELOPMENTS

51.    On April 19, 2023, following the end of the Class Period, BIS announced that it had imposed a $300 million civil penalty against Seagate for violating the ban on HDD sales to Huawei—the largest standalone administrative resolution in the agency's history—after Seagate *admitted* that it had violated U.S. export control and sanctions laws against Huawei.  The $300

million administrative penalty represents more than twice what Seagate profited from the exports to Huawei.

52.    BIS further revealed that, through its investigation, it had determined that from August 17, 2020 to September 29, 2021, Seagate exported more than 7.4 million HDDs to Huawei, valued at approximately $1.1 billion USD, without authorization from BIS.  BIS further revealed that, throughout 2021, after Seagate's competitors had already stopped selling HDDs to Huawei, Seagate took advantage of its near monopoly on sales to Huawei by "repeatedly authoriz[ing] extending lines of credit to Huawei totaling more than $1 billion dollars," thereby fueling sales to Huawei.

## VIII.   LOSS CAUSATION

53.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  These misleading statements and omissions artificially inflated the price of Seagate common stock and operated as a fraud or deceit on the Class (as defined below).  Later, when the alleged misrepresentations and fraudulent conduct were disclosed to the market on October 26, 2021, March 8, 2022, July 21, 2022, and October 26, 2022, the price of Seagate common stock fell precipitously as the prior artificial inflation came out of the price over time.  As a result of their purchases of Seagate common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## IX.   CLASS ACTION ALLEGATIONS

54.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Seagate common stock during the Class Period (collectively, the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Seagate and their families and affiliates.

55.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court.  As of April 24, 2023, Seagate had over 207 million shares of common stock outstanding, owned by hundreds or thousands of investors.

56.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

        (a)     Whether Defendants violated the Exchange Act;

        (b)     Whether Defendants omitted and/or misrepresented material facts;

        (c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

        (d)     Whether the Officer Defendants are personally liable for the alleged misrepresentations and omissions described herein;

        (e)     Whether the Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

        (f)     Whether Defendants' conduct impacted the price of Seagate common stock;

        (g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

        (h)     The extent of damage sustained by Class members and the appropriate measure of damages.

57.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from the Defendants wrongful conduct.

58.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## X.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

60.    Seagate's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

61.    The Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Seagate who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI.   PRESUMPTION OF RELIANCE

62.    At all relevant times, the market for Seagate common stock was an efficient market for the following reasons, among others:

(a)    Seagate common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Seagate filed periodic public reports with the SEC and NASDAQ;

(c)    Seagate regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Seagate was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales

force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

63.     As a result of the foregoing, the market for Seagate common stock promptly digested current information regarding Seagate from all publicly available sources and reflected such information in the price of Seagate common stock. Under these circumstances, all purchasers of Seagate common stock during the Class Period suffered similar injury through their purchase of Seagate common stock at artificially inflated prices and the presumption of reliance applies.

64.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in Affiliated *Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Seagate's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Company's regulatory adequacy and liquid assets, that requirement is satisfied here.

## XII.    SCIENTER ALLEGATIONS

65.     As alleged herein, the Defendants acted with scienter since the Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding Seagate, their control over, and/or receipt and/or modification of Seagate's allegedly materially misleading misstatements and/or

their associations with the Company which made them privy to confidential proprietary information concerning Seagate, participated in the fraudulent scheme alleged herein.

## XIII.   CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

**(Against All Defendants)**

66.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

67.     During the Class Period, the Defendants carried out a plan, scheme, and course of conduct which intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase Seagate common stock at artificially inflated prices.

68.     The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

70.     During the Class Period, the Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.     The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.

The Defendants engaged in this misconduct to conceal Seagate's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

72.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Seagate common stock at artificially inflated prices and were harmed when the truth about Seagate negatively impacted the price of the Company's common stock. Plaintiff and the Class would not have purchased Seagate common stock at the prices they paid, or at all, had they been aware that the market prices for Seagate common stock had been artificially inflated by the Defendants' fraudulent course of conduct.

73.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

74.     By virtue of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act

### (Against the Officer Defendants)

75.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

76.     The Officer Defendants acted as controlling persons of Seagate within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Seagate, the Officer Defendants had the power and ability to control the actions of Seagate and its employees.  By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

XIV.   **PRAYER FOR RELIEF**

77.   WHEREFORE, Plaintiff prays for judgment as follows:

(b)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(c)   Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(d)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(e)   Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

XV.   **JURY DEMAND**

78.   Plaintiff demands a trial by jury.

1   DATED: July 26, 2023                    Respectfully submitted,

2                                           **BERNSTEIN LITOWITZ BERGER**
                                              **& GROSSMANN LLP**

3                                           */s/ Jonathan D. Uslaner*
4                                           JONATHAN D. USLANER (Bar No. 256898)
                                            (jonathanu@blbglaw.com)
5                                           2121 Avenue of the Stars, Suite 2575
                                            Los Angeles, CA 90067
6                                           Tel:     (310) 819-3470

7                                                     -and-

8                                           HANNAH ROSS
                                            (hannah@blbglaw.com)
9                                           AVI JOSEFSON
                                            (avi@blbglaw.com)
10                                          SCOTT R. FOGLIETTA
                                            (scott.foglietta@blbglaw.com)
11                                          1251 Avenue of the Americas
                                            New York, NY 10020
12                                          Tel:     (212) 554-1400
                                            Fax:     (212) 554-1444

13                                          *Counsel for Plaintiff Public Employees'*
14                                          *Retirement System of Mississippi*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Tricia L. Beale, on behalf of the Public Employees' Retirement System of Mississippi ("Mississippi"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am a Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi. I am fully authorized to enter into and execute this Certification on behalf of Mississippi. I have reviewed the complaint and authorize its filing.

2. Mississippi did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Mississippi is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Mississippi's transactions in the Seagate Technology Holdings PLC securities that are the subject of this action are set forth in the chart attached hereto.

5. Mississippi has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Portland General Electric Company Securities Litigation*,
No. 20-cv-1583 (D. Or.)
*Habelt v. iRhythm Technologies, Inc.*, No. 21-cv-776 (N.D. Cal.)
*Sun v. TAL Education Group*, No. 22-cv-1015 (S.D.N.Y.)
*City of Miami Fire Fighters' and Police Officers' Retirement Trust v. Cerence Inc.*,
No. 22-cv-10321 (D. Mass.)
*City of Warwick Retirement System v. Catalent, Inc.*, No. 23-cv-1108 (D.N.J.)

6. Mississippi is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Schaeffer v. Signature Bank*, No. 23-cv-1921 (E.D.N.Y.)

7. Mississippi has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

*In re New Oriental Education & Technology Group Inc. Securities Litigation*, No. 22-cv-1014 (S.D.N.Y.)
*Cupat v. Palantir Technologies Inc.*, No. 22-cv-2384 (D. Colo.)
*Collinsville Police Pension Board on Behalf of the Collinsville Police Pension Fund v. Discovery, Inc.*, No. 22-cv-8171 (S.D.N.Y.)

8. Mississippi will not accept any payment for serving as a representative party on behalf of the Class beyond Mississippi's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this **26** day of July, 2023.

Tricia L. Beale
*Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi on behalf of the Public Employees' Retirement System of Mississippi*

**Public Employees' Retirement System of Mississippi**
**Transactions in Seagate Technology Holdings PLC**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 2/1/2021 | 2,456 | 66.7400 |
| Purchase | 2/26/2021 | 107 | 73.2269 |
| Purchase | 9/17/2021 | 1,531 | 83.7362 |
| Purchase | 1/7/2022 | 28,448 | 111.1542 |
| Purchase | 2/28/2022 | 41,155 | 103.0871 |
| Purchase | 3/28/2022 | 7,379 | 91.8808 |
| Purchase | 8/9/2022 | 28,846 | 77.3400 |
| Sale | 9/18/2020 | (405) | 48.8245 |
| Sale | 12/18/2020 | (481) | 64.7230 |
| Sale | 3/19/2021 | (3,595) | 74.6334 |
| Sale | 5/14/2021 | (789) | 97.9700 |
| Sale | 6/18/2021 | (143) | 85.3017 |
| Sale | 8/27/2021 | (576) | 86.3100 |
| Sale | 9/15/2021 | (523) | 84.3500 |
| Sale | 10/8/2021 | (1,934) | 79.9300 |
| Sale | 11/30/2021 | (309) | 102.6726 |
| Sale | 12/17/2021 | (500) | 104.5100 |
| Sale | 4/27/2022 | (38,400) | 82.1735 |
| Sale | 6/17/2022 | (665) | 72.6922 |
| Sale | 6/28/2022 | (38,582) | 73.2616 |